# No. 25-2109

In the

# United States Court of Appeals
### For the Tenth Circuit

**United States of America**,
        *Plaintiff-Appellant*

*v.*

**Komiljon Toirov**,
        *Defendant-Appellee*

On Appeal from the United States District Court
for the District of New Mexico
D.C. No. 25-CR-1801 (The Hon. Sarah M. Davenport)

## MEMORANDUM REPLY BRIEF FOR THE UNITED STATES

October 2025

    Ryan Ellison
    *Acting United States Attorney*
    District of New Mexico
    201 3rd St. NW, Suite 900
    Albuquerque, NM  87102
    (505) 346-7274

# TABLE OF CONTENTS

PAGE

TABLE OF CASES AND OTHER AUTHORITIES……………………………….ii

REPLY……………………………………………………………………………...1

I. There Are No Alternative Grounds for Affirmance. ................................. 1

    A. The District Court Accepted the Government's Argument That If No Knowledge of the NMNDA Is Required, Toirov Is a Flight Risk Who Should Be Detained. ......................................................... 1

    B. As the District Court Correctly Found, Toirov's Guilty Plea to Improper Entry Is Strong Evidence of His Mental State Under the Government's Theory. ............................................................. 4

II. The Government Has the Better Reading of Section 797 and Section 1382. ........................................................................................................ 5

    A. The Government's Reading Does Not Render Any Part of Section 797 Superfluous. ...................................................................... 5

    B. The Government's Reading Is Consistent With Authority Interpretating Section 1382. ........................................................ 6

    C. No Grievous Ambiguity Justifies Resort to the Rule of Lenity..... 8

CONCLUSION........................................................................................ 11

TYPE-VOLUME CERTIFICATION .............................................................. 12

CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION ...................... 13

# TABLE OF CASES

PAGE

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................................................... 13

*Crandon v. United States,*
  494 U.S. 152 (1990) .................................................................................... 12

*Huddleston v. United States,*
  415 U.S. 814 (1974) .................................................................................... 12

*Morissette v. United States,*
  342 U.S. 246 (1952) .................................................................................... 13

*Rehaif v. United States,*
  588 U.S. 225 (2019) .................................................................................... 13

*Staples v. United States,*
  511 U.S. 600 (1994) .................................................................................... 13

*United States v. Castleman,*
  572 U.S. 157 (2014) .................................................................................... 11

*United States v. Cottier,*
  759 F.2d 760 (9th Cir. 1985) ...................................................................... 10

*United States v. Feola,*
  420 U.S. 671 (1975) .................................................................................... 12

*United States v. Floyd,*
  477 F.2d 217 (10th Cir. 1973) .................................................................... 10

*United States v. Madrigal-Valadez,*
  561 F.3d 370 (4th Cir. 2009) ...................................................................... 11

*United States v. Parrilla Bonilla,*
  648 F.2d 1373 (1st Cir. 1981) ...................................................................... 9

Statutes

8 U.S.C. § 1325 ................................................................................................. 7

18 U.S.C. § 3142(g)(1) ...................................................................................... 4

18 U.S.C. § 3142(g)(2) ...................................................................................... 8

Other Authorities

*Substantive Canons and Faithful Agency*,
   90 B.U. L. Rev. 109 (2010) ......................................................................... 12

# REPLY

I. There Are No Alternative Grounds for Affirmance.

    A. The District Court Accepted the Government's Argument That If No Knowledge of the NMNDA Is Required, Toirov Is a Flight Risk Who Should Be Detained.

In Toirov's memorandum answer brief, he contends that this Court need not "reach the statutory interpretation question" and proposes that it instead "affirm solely because the Government did not dispute that Mr. Toirov was not a flight risk despite ample opportunity to argue the risk of nonappearance…." Def. Br. 2-3.

That proposal, however, is divorced from the record. The government has always argued that Toirov posed a flight risk (or "risk of nonappearance"). Its detention briefing in district court opened by asserting that Toirov was "a flight risk" and that there were "no conditions that w[ould] reasonably assure the defendant's appearance at future court proceedings." 1A.30. The government proceeded to argue that "the 'nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1) weigh[ed] heavily against the release of the defendant, as a risk of non-appearance." *Id.* at 33. As the government pointed out, Toirov had already pled guilty to entering the country illegally, and "[t]he obvious purpose behind sneaking across the border in the middle of the night is to go freely in the country, without official recognition, supervision, or legal status." *Id.* The

1

circumstances thus suggested "a strong incentive to disobey any conditions of release—to avoid conviction, further jail time, and deportation." *Id*. Accordingly, the government submitted, there were "no conditions that c[ould] be fashioned to secure [Toirov's] appearance in future court proceedings." *Id*. After addressing the strength of the evidence, the government concluded by asserting (not once but twice) that Toirov should be detained as a "flight risk." *Id*. at 35.

At the hearing before the district court, the prosecutor reiterated that the government was "requesting that the defendant be detained as a flight risk." 3A.41. Relating both the nature and circumstances of the offense and the weight of the evidence to the question of flight risk, he elaborated:

> [Toirov] came here with the purpose—with the desire to remain undetected. And should he be released and have the opportunity to go into society, the Government has a very real concern that he would not come back to court for future proceedings, that he knows that he would almost certainly be convicted of this offense, in light of the weight of the evidence, and that he would be subsequently deported.

*Id*. at 42. In a later pleading, the government told the court that it continued to assert that Toirov was a flight risk. 4A.10-11. In short, the government clearly and consistently argued below that Toirov should be detained as a flight risk.

Toirov's focus on what the government argued is not just inconsistent with the record. It also ignores that the district court's flight-risk

2

determination turned entirely on what it deemed to be the weight of the evidence, as informed by the disputed mens rea requirements. Consider first the district court's response to this Court's limited remand during the first appeal. There, the district court expressly found that if the government were correct about the mens rea elements, then Toirov "present[ed] a risk of non-appearance" and "no condition or combination of conditions c[ould] reasonably assure his return to court." 4A.18. After the second remand from this Court, the district court reaffirmed that if Toirov's reading of the statute were correct, then he would not pose a flight risk, 4A.31, primarily because under Toirov's view of the statute, an acquittal would be so likely that Toirov would be willing to return for trial, *id.* at 27-29. These opposite conclusions—resting upon opposing statutory readings—leave no doubt that it was the district court's misreading of the statutes, rather than any particular feature of the government's flight-risk argument, that led to its decision to release Toirov pending trial.

Because the government squarely put the issue of Toirov's flight risk before the district court, and because the district court resolved that question against the government based on its erroneous reading of the relevant statutes, there is no merit to Toirov's suggestion that this Court could affirm without reaching the questions of statutory interpretation.

3

## B. As the District Court Correctly Found, Toirov's Guilty Plea to Improper Entry Is Strong Evidence of His Mental State Under the Government's Theory.

Toirov appears to suggest a second alternative path to affirmance: that even if the government is correct about the statutory elements, his conviction for illegal entry under 8 U.S.C. § 1325 is "insufficient" to establish that he had an unlawful purpose in crossing the border into the country and thus into the NMNDA. Def. Br. 20-24. As the government understands this argument, Toirov believes that if the mens rea established by his guilty plea to § 1325 is not identical to that required by the NDA offenses, then the government's evidence is weak even if its statutory views prevail.

While Toirov's premise is correct—the statutes do not share identical mens rea elements—his conclusion does not follow. To be sure, Sections 797 and 1382 each require something that Section 1325 does not. Illegal entry under § 1325(a)(1) requires that the defendant be an alien who intentionally enters the country and does so "at any time or place other than as designated by immigration officers[.]" In contrast, to violate Section 797 in this context, the defendant must *know* that the entry is unlawful. *See* 3A.25 (prosecutor agreeing that a § 1325 violation establishes the required mens rea for the NDA offenses "[a]s long as the defendant knew that what he was doing was unlawful"). And to violate Section 1382, the defendant must be entering the NDA for an unlawful purpose.

4

These distinctions, however, do not prevent Toirov's illegal entry conviction from serving as powerful proof of his violation of Sections 797 and 1382. In pleading guilty to the illegal entry, Toirov admitted that he is an alien who intentionally entered the United States and that he did so at a time and place not designated by immigration officers. These are crucial admissions. Everything else needed to establish intent for a violation of Sections 797 and 1382 is supplied by the circumstances: his crossing the border in the middle of the desert, miles from the nearest port of entry, and hiding in brush when the Border Patrol arrived. Far from having "no bearing" on the strength of the evidence, Def. Br. 24, Toirov's illegal entry conviction supplies strong evidence of his commission of the NDA offenses. The district court was correct on this point: if the government is right about the statutory elements, then the strength of the evidence weighs heavily in favor of detention under 18 U.S.C. § 3142(g)(2).

## II. The Government Has the Better Reading of Section 797 and Section 1382.

### A. The Government's Reading Does Not Render Any Part of Section 797 Superfluous.

Defending the district court's interpretation of Section 797, Toirov argues that the government's reading would render "wholly superfluous" § 797(b)'s requirement that the regulation or order be posted in "conspicuous and appropriate places." Def. Br. 12. He is mistaken. Congress may well have

5

desired conspicuous posting because increasing awareness of the security regulation or order is likely to increase compliance with it—thus advancing the very purpose of the regulation or order. Stores post signs saying shoplifting is a crime not because theft prosecutions require specific knowledge of illegality but because such warnings are thought to *deter* shoplifting in the first place. So too here.

### B. The Government's Reading Is Consistent With Authority Interpretating Section 1382.

Contrary to Toirov's suggestion, neither this Court nor any of the other circuits he cites have held that every conviction for entering military property for an unlawful purpose requires notice of the property's restricted military status. Def. Br. 16-20. In advancing this argument, Toirov conflates the common scenario for a Section 1382 violation with the statutory requirements. As the case law demonstrates, the typical Section 1382 prosecution involves a defendant entering restricted military property without authorization but also without intent to commit any other crime. In that situation—that is, where the unauthorized entry is itself the bad purpose, "it must be shown that the defendant had knowledge or notice that such entry was, in fact, prohibited." *United States v. Parrilla Bonilla*, 648 F.2d 1373, 1377 (1st Cir. 1981). This does not mean, however, that Section 1382 cannot be satisfied with a different unlawful purpose. To adopt that

position would ignore the capacious language of the statute, which prohibits "go[ing] upon" military property "for *any* purpose prohibited by law or lawful regulation" (emphasis added).

None of Toirov's cases say anything to the contrary. In *United States v. Floyd*, 477 F.2d 217, 220 (10th Cir. 1973), the defendants were protesters who knowingly entered Tinker Air Force Base without authorization to protest the Vietnam War. It was not alleged that they intended to destroy military property or commit any other crime during that protest; their only unlawful purpose, then, was entering. *Cf.* Def. Br. 17 (suggesting that "the intent to protest was the prohibited purpose"). Under that circumstance, the Court required proof that the defendants were prohibited from entering the base and knew that they were so prohibited. 477 F.2d at 224. The Court did not opine on situations not before it, such as when a defendant is alleged to have entered the military property for a different unlawful purpose.

Neither did the courts in the other cases Toirov cites. *United States v. Cottier*, 759 F.2d 760, 761-62 (9th Cir. 1985) (Def. Br. 18) also involved a protester who was not alleged to have intended to violate any law other than the regulation restricting access to the base in question. There, the court recognized that the statute's "prohibited purpose" "may be the unauthorized entry itself," *id.* at 762, and that "[w]here *entry alone* is the basis of the violation, knowledge that the entry is unauthorized is an essential element of

7

a section 1382 offense," *id.* (emphasis added). And in *United States v. Madrigal-Valadez*, 561 F.3d 370, 372, 375-76 (4th Cir. 2009) (Def. Br. 16), the Fourth Circuit simply held that the government was required to prove that the defendant knew he was prohibited from entering the base where his "sole purpose" in doing so was to drop off his passenger.

Toirov's case is different. He has not been charged with "entry alone" but instead with entering the NMNDA for the purpose of effecting an unlawful entry into the United States. The particular type of knowledge necessary for "entry alone" cases is not required here. Instead, the statute's requirement that a defendant "go[] upon" military property for "any purpose prohibited by law" is satisfied by his entry onto that property for the purpose of unlawfully entering the United States.

### C. No Grievous Ambiguity Justifies Resort to the Rule of Lenity.

Because Congress's drafting choices in these two statutes are evident and should be respected, there is no role for lenity in this case. *Cf.* Def. Br. 24-25. Going back half a century, the Supreme Court has consistently explained that "'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended.'" *United States v. Castleman*, 572 U.S. 157, 172-73 (2014)

(citation omitted); *see Huddleston v. United States*, 415 U.S. 814, 831 (1974). That demanding formulation ensures that unelected judges respect "the product of the legislative process" and refrain from applying a substantive canon that could alter a statute's meaning unless the statute is truly and irremediably ambiguous. *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 123 (2010). That is not the case here, as both Sections 797 and 1382 speak directly to the state of mind required for conviction.

In any event, neither of the dual purposes served by the rule of lenity—"ensur[ing] both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability," *Crandon v. United States*, 494 U.S. 152, 158 (1990)—would be advanced by applying that rule here. A defendant who acts "willfully" and "for a[] purpose prohibited by law" cannot complain that he lacked "fair warning" that his conduct has exposed him to criminal liability. *See United States v. Feola*, 420 U.S. 671, 685 (1975) ("It is no snare for the unsuspecting" where the defendant "knows from the very outset that his planned course of conduct is unlawful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected."). And respecting Congress's selection of a specific *mens rea*—rather than judicially imposing scienter elements found nowhere in the enacted text—

9

best ensures that the "legislature[], not courts, define[s] criminal liability" under these provisions.

In addition, when resolving any ambiguity, this Court should consider that the Supreme Court has "ha[s] typically declined to apply the presumption in favor of scienter in cases involving statutory provisions that form part of a 'regulatory' or 'public welfare' program and carry only minor penalties." *Rehaif v. United States*, 588 U.S. 225, 232 (2019). The Court has described that class as including offenses that simply "create the danger or probability of [injury] which the law seeks to minimize," *Morissette v. United States*, 342 U.S. 246, 256 (1952), and carry "relatively small" penalties in comparison to offenses that single out serious wrongdoers, *id.*

Both parts of that test are met here. Sections 797 and 1382 form part of a "regulatory" program that seeks to promote compliance with military orders and regulations. Those rules themselves serve to minimize "the danger or probability of [injury]"—such as that presented by the unauthorized entry onto military property. Furthermore, in light of the "extensive and complex" federal regulatory regime governing "immigration and alien status," *Arizona v. United States*, 567 U.S. 387, 395 (2012), a person crossing the United States' international borders "should be alerted to the probability of strict regulation," *Staples v. United States*, 511 U.S. 600, 607 (1994). In such reticulated regulatory regimes, the Supreme Court has assumed that

"Congress intended to place the burden on the defendant to 'ascertain at his peril whether his conduct comes within the inhibition of the statute.'" *Id.* (brackets and citation omitted). And Sections 797 and 1382 are misdemeanor offenses that contemplate maximum custodial sentences of one year and six months, respectively; they thus fall within the bucket of "minor penalt[y]" provisions that do not warrant judicial imposition of a heightened *mens rea* standard.

In sum, because Congress's intent is clear from the text and context of Sections 797 and 1382, there is no role for the rule of lenity.

## **CONCLUSION**

For the reasons provided both here and in the government's Memorandum Brief, the Court should reverse the district court's order releasing Toirov pending his trial on the NDA charges.

Respectfully submitted,

*s/ Ryan Ellison*

RYAN ELLISON
Acting United States Attorney
District of New Mexico
201 Third Street NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274
ryan.ellison@usdoj.gov

11

## **TYPE-VOLUME CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 2,492 words. I relied on my word processor to obtain the count. My word processing software is Word 2016.

*s/ Ryan Ellison*
RYAN ELLISON
Acting United States Attorney

**CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION**

I HEREBY CERTIFY that the foregoing brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on October 28, 2025.

I ALSO CERTIFY that Amanda Skinner, attorney for Defendant-Appellee Komiljon Toirov, is a registered CM/ECF user, and that service will be accomplished by the appellate CM/ECF system.

*s/ Ryan Ellison*
RYAN ELLISON
Acting United States Attorney
